AUSA: William G. Kanellis        Telephone: (202) 674-5661

Special Agent : Brandon Barks, FBI        Telephone: (313) 434-4602

AO 91 (Rev. 08/09) Criminal Complaint

# ORIGINAL UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

United States of America,

Plaintiff,

v.

D-1 ELAINE LOVETT,
D-2 MICHELLE FREEMAN,

Case: 2:13-mj-30764
Judge: Unassigned,
Filed: 12-04-2013 At 12:11 PM
CMP: SEALED MATTER (LCB)

Defendant(s).

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of <u>July 2006 to present</u>, in the county of <u>WAYNE COUNTY</u> in the <u>Eastern</u> District of <u>Michigan</u>, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18 U.S.C. § 1347 | Health Care Fraud |
| Title 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud |

This criminal complaint is based on these facts:
SEE ATTACHED.

☑ Continued on the attached sheet.

_____
Complainant's signature

Brandon Barks, Special Agent, HHS-OIG
Printed name and title

Sworn to before me and signed in my presence.

Date: December 4, 2013

_____
Judge's signature

City and state: Detroit, Michigan

Hon. Mona K. Majzoub, United States Magistrate Judge
Printed name and title

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

The undersigned, Brandon Barks, being first duly sworn, hereby deposes and states as follows:

## I. Affiant's Background and Qualifications

1. I, Brandon Barks, hereinafter referred to as the Affiant, am a Special Agent employed by the Federal Bureau of the Investigation (FBI). I have been so employed since March 2010. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). In that capacity, I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

2. As part of my duties, I am authorized to conduct criminal investigations of individuals, organizations, and businesses that have violated federal laws, including 18 U.S.C. § 1347 (Health Care Fraud) and 18 U.S.C. § 1349 (Health Care Fraud Conspiracy). My chief responsibility is the investigation of fraud in the Detroit, Michigan area involving Federal Health Care Programs, including Medicare. As a Special Agent with FBI, I have received basic criminal investigator training, as well as specialized training in the investigation of fraud and financial crime.

3. The affidavit sets forth facts in support of a criminal complaint alleging that Elaine Lovett (Lovett) and Michelle Freeman (Freeman) conspired to engage in Medicare fraud in violation of 18 U.S.C. § 1349, and submitted or caused to be submitted fraudulent claims to Medicare in violation of 18 U.S.C. § 1347. The offenses occurred while the defendants operated ABIX, LLC, and were associated with clinics operating in and around Detroit, Michigan.

4. I have knowledge of the facts set forth in this Affidavit as a result of my participation in the investigation as well as information provided to me by other law enforcement agents involved in this investigation and others. Information pertinent to this investigation was also provided by TrustSolutions, LLC, and Cahaba Safeguard Administrators, LLC (Cahaba), private entities which contract with the United States Department of Health and Human Services (HHS) to perform investigations and audits designed to protect the Medicare program from waste, fraud, and abuse. Since this Affidavit is being submitted for the limited purpose of supporting a criminal complaint, I have not included each and every fact known to me concerning this investigation.

## II. The Medicare Program

5. The Medicare Program (Medicare) is a federally-funded health care program providing benefits to persons who are over the age of sixty-five or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency within HHS. Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

6. Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

7. Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

8. This investigation involves psychotherapy, chiropractic, and in-home and office physician services, which are all services covered by Medicare Part B.

9. Medicare claims for Part B are processed and paid by private insurance organizations, known as carriers, who contract with CMS to administer their specific part of the Medicare program.

### III. CPT Codes

10. The American Medical Association assigns and publishes numeric codes, known as the Current Procedural Terminology (CPT) and Health Care Procedure Common Coding System (HCPCS) codes. The codes are a systematic listing, or universal language, used to describe the procedures and services performed by health care providers.

11. The procedures and services represented by the CPT and HCPCS codes are health care benefits, items, and services within the meaning of 18 U.S.C. § 24(b). They include codes for office visits, diagnostic testing and evaluation, and other services. Health care providers use CPT and HCPCS codes to describe the services rendered in their claims for reimbursement to health care benefit programs.

12. Health care benefit programs, including Medicare, use these codes to understand and evaluate the claims submitted by providers and to decide whether to issue or deny payment. Each health care benefit program establishes a fee or reimbursement level for each service described by a CPT or HCPCS code.

13. Health care providers often seek reimbursement from insurance carriers on forms known as CMS Form 1500. On the form, the provider identifies itself by Provider Identification Number (PIN) or Tax Identification Number (TIN), identifies the beneficiary who received the services, describes the illness or injury that makes the services medically necessary, and identifies the services provided by

CPT and HCPCS codes. In response to each claim, the insurance carrier issues a payment or denial. The Electronic Data Interchange permitted a provider, or a third party company assigned by the provider, to electronically submit claims to Medicare.

14. Medicare coverage for chiropractic and psychotherapy services are limited to services provided (1) "incident to" a physician's practice, or (2) by certain non-physician clinicians who meet specific licensing criteria and are registered Medicare providers. If the services are provided incident to a physician's practice, a physician must be physically present when the services are provided.

## IV. General Health Care Fraud Scheme

15. This investigation was initiated based upon information received while investigating Medicare providers associated with Physician A. As set forth below, the evidence shows that defendants Elaine Lovett (Lovett) and Michelle Freeman, (Freeman), who owned and controlled a billing company called ABIX, obtained Medicare PINs from ABIX clients who were Medicare providers (ABIX Clients), and used these PINs to submit claims to Medicare for medical services that Lovett and Freeman knew were not provided.

| ABIX Client | ABIX Client Owner/Operator | ABIX Client Medicare Provider | Purported Medical Service Provided |
|---|---|---|---|
| Company A | Physician A | Physician A | Physician's and Related Services |
| Company B | Witness A | Witness A | Psychotherapy Services |
| Company C | Witness B | Witness B | Chiropractic Services |

16. ABIX was a Michigan corporation with a registered address of 21910 Greenfield Road, Oak Park, Michigan. ABIX's articles of incorporation were filed on or about July 26, 2006. ABIX purported to provide Medicare enrollment and billing services to Medicare providers. At all relevant times, ABIX was owned and controlled by Lovett and Freeman.

17. As set forth below, the evidence shows that through ABIX, Lovett and Freeman knowingly and routinely (1) arranged or facilitated a working relationship between ABIX Clients and Physician A so that these ABIX Clients could bill Medicare for services performed in conjunction with Physician A; (2) used these ABIX Clients' Medicare PINs to submit claims to Medicare for psychotherapy and chiropractic services that Lovett and Freeman knew were not provided by these ABIX Clients; (3) obtained control of these ABIX Clients' bank accounts to ensure that ABIX would receive proceeds from these fraudulent billings; and (4) received and distributed to themselves the proceeds of these fraudulent billings.

## V. Facts Supporting Allegations

18. Lovett and Freeman submitted, or caused to be submitted, Medicare enrollment applications and billing services for ABIX Clients, including approximately 21 companies owned or operated by Physican A (Physician A Companies), as well as other companies that purportedly rendered chiropractic, psychotherapy, and other medical services.

19. Company A, one of approximately 21 companies owned or controlled by Physician A, was a Michigan corporation. During a November 6, 2009 interview with law enforcement agents, Physician A told agents he purchased Company A for

$300,000 and operated it at a Detroit, Michigan address. Company A purported to provide physicians' and other medical services.

20. Company B was a Michigan corporation that purported to do business at an address in West Bloomfield, Michigan. Witness A was listed as Company B's registered agent. Witness A confirmed to law enforcement agents that he/she owned and operated Company B. Company B was certified as a Medicare provider in or around December 2008. Company B purported to provide in-home psychotherapy services.

21. Company C was a Michigan company that purported to do business at an address in Detroit, Michigan. Company C was certified as a Medicare provider in or around November 1988 and was issued a Medicare PIN. Company C purported to provide chiropractic and related medical services. Company C was owned and operated by Witness B.

22. Medicare records reflect that Companies D, E, F, G, and H were each ABIX Clients. Witness C, a former ABIX employee, told law enforcement that these companies were affiliated with or controlled by Physician A.

23. Law enforcement interviewed Physician A on or about October 11, 2011. Physician A said that he used ABIX as his billing company. Medicare records confirm that billings for Physician A Companies were submitted by ABIX.

24. In or around June 2009, many Physician A Companies were suspended by Medicare, meaning that Physician A could no longer bill Medicare through these companies. Once suspended, Lovett and Freeman, acting on behalf of Physician A, solicited other licensed Medicare providers who were ABIX Clients to work with or

for Physician A and his companies in order to continue submitting Physician A's billings to Medicare. Lovett and Freeman also obtained these ABIX Clients' Medicare and banking information to allow Lovett and Freeman to control the money Medicare paid these companies. ABIX then used these ABIX Clients' PINs to bill Medicare for medical services that were not rendered by these companies, as if they had been.

25. In June and July 2013, law enforcement agents interviewed ABIX Clients that Lovett and Freeman solicited to work with Physician A's Companies.

## ABIX Billing Under Company B's PIN

26. On July 17, 2013 and November 22, 2013, law enforcement interviewed Witness A. Witness A was a licensed masters-level social worker in the state of Michigan. Witness A said that he/she was the owner and operator of Company B, and used ABIX to submit Medicare claims for Company B. Company B's Medicare billing data reflect that Company B provided in-home psychotherapy services.

27. In or around May 2013, Witness A received a telephone call from Lovett. During the call, Lovett told Witness A, in substance, that Physician A had some businesses that were having problems getting paid by Medicare. Lovett proposed that Physician A submit psychotherapy claims under Company B's PIN. Witness A said that he/she wanted to learn more about the proposal, and asked Lovett to set up a meeting between Witness A and Physician A.

28. Witness A told law enforcement that the Tuesday after Memorial Day 2013 (May 28, 2013), Witness A telephoned Lovett and told her that no one from Physician A's office or ABIX had contacted her about a meeting. Witness A told Lovett that Witness A did not feel comfortable moving forward with an agreement

with Physician A because he/she had never met Physician A. Lovett responded that ABIX had already submitted some of Physician A's claims under Company B's PIN. During that conversation, Witness A told Lovett to stop submitting Physician A's claims under Company B's PIN.

29. Company B's Medicare claims data show that from on or about May 29, 2013 (the day after Witness A instructed Lovett to stop billing under Company B's PIN) through on or about June 10, 2013, ABIX submitted approximately 228 claims to Medicare under Company B's PIN for psychotherapy services purportedly rendered to Physician A's patients, amounting to approximately $31,857.00.

30. After this May 28, 2013 telephone conversation, Witness A observed that there was an extra $15,000 in the bank account into which Medicare payments to Company B had been deposited. Witness A telephoned Lovett and asked why the extra money was in Company B's bank account and why ABIX was still submitting Physician A's claims under Company B's PIN. Lovett told Witness A that nothing could be done about claims that were already submitted to Medicare. This statement was false, because Medicare claims can be reversed. Witness A later asked Freeman about the extra money in Company B's account. Freeman told Witness A that the billers had made a mistake and that she would submit billing reversals to Medicare. The available claims data for Company B shows that claims submitted by ABIX during this time frame were paid to Company B.

31. Company B's Medicare claims data show that ABIX submitted claims to Medicare under Company B's PIN for psychotherapy services Witness A purportedly provided to Medicare beneficiary 1 (MB1). ABIX billed Medicare for services purportedly provided to MB1 by Witness A on or about October 31, 2012 –

more than six months before May 2013, when Witness A was approached by ABIX about Physician A billing under Company B's PIN.

32. Witness A told law enforcement that Witness A had never met Physician A, had never visited any of Physician A's clinics, did not provide services to MB1, and did not recognize MB1's name.

### ABIX Billing under Company C's PIN

33. On June 27, 2013, Witness B was interviewed by law enforcement. Witness B told law enforcement that she owned and operated Company C. Michigan state records reflect that Witness B was a licensed chiropractor in the state of Michigan.

34. Witness B told law enforcement that ABIX had been Company C's biller since approximately 2008. Witness B said that he/she was introduced to Physician A through ABIX.

35. On or about April 24, 2013, Witness B entered into a contract with Physician A to provide services at Physician A's clinic in Detroit. Witness B did not start working at Physician A's clinic until May 2013, approximately two weeks after signing the contract with Physician A.

36. Witness B told law enforcement that both Lovett and Freeman were aware of Witness B's contract with Physician A. ABIX submitted the Medicare billings for the work Witness B did with Physician A. When Witness B signed the contract with Physician A, Freeman requested that Witness B also sign a document giving ABIX access to Witness B's bank account, where the proceeds of Company C's Medicare billings were deposited. Witness B signed the document and gave ABIX access to

Witness B's bank account. ABIX immediately withdrew proceeds from Company C's Medicare billings for services purportedly provided by Witness B to Physician A's patients.

37. Witness B told law enforcement that after Witness B's June 27, 2013 interview with law enforcement, he/she decided not to return to Physician A's clinic.

38. Company C's Medicare claims data show that ABIX submitted approximately 731 claims to Medicare for chiropractic services that Witness B purportedly provided to Physician A's patients for five months prior to when Witness B was employed by Physician A – i.e., for dates of service between on or about November 11, 2012, and on or about April 24, 2013 (the day Witness B signed the contract with Physician A). All of these claims were submitted to Medicare by ABIX on or about, or after, May 1, 2013. These claims totaled approximately $44,845.00, of which Medicare paid approximately $11,931.15.

39. Company C's Medicare claims data show that ABIX submitted claims to Medicare for chiropractic services Witness B purportedly provided to Medicare beneficiary 2 (MB2) on or about March 20, 2012.

40. Witness B told law enforcement that Witness B provided no services at Physician A's clinic before May 2013.

41. Witness B told law enforcement that at Physician A's clinic, billing sheets were already signed by a patient before Witness B saw a patient or received the billing sheet. Witness B said that at Physician A's clinic, Witness B was provided billing sheets for services that he/she did not provide. Witness B said that he/she did not sign these billing sheets.

42. Witness B provided law enforcement copies of other billing sheets for services he/she purportedly provided to 12 beneficiaries at Physician A's clinic. One billing sheet reflects that Witness B provided services to Medicare Beneficiary 3 (MB3) on or about March 12, 2013. Witness B said that he/she did not render those services to MB3, and did not sign MB3's billing sheet.

43. In or around April 2013, law enforcement agents interviewed Witness C, a former ABIX employee.

### ABIX Employee Adding Diagnosis Codes

44. Witness C told law enforcement that her job responsibilities at ABIX included submitting billings for ABIX Clients. Witness C said that Lovett and Freeman instructed her on how to do the billing at ABIX. Lovett told Witness C to add a second diagnosis code to billing sheets that only listed one diagnosis code. Lovett instructed Witness C to always add hypertension or back pain to a claim with only one diagnosis code to ensure that the claim was paid by Medicare. Lovett told Witness C that all patients suffer from hypertension and back pain.

45. In and around May and June 2013, law enforcement agents interviewed Medicare beneficiaries regarding the services billed under the PINs of ABIX Clients.

### Claims for Services to MB1

46. On or about June 27, 2013, law enforcement interviewed Medicare beneficiary 1 (MB1).

47. MB1 told law enforcement agents he/she had been a patient at Physician A's clinic in Detroit. MB1 said that he/she had never visited Company D, Company E, or Company H.

48. Medicare claims data for Company D, Company E, and Company H show that ABIX used MB1's Medicare information to bill for services purportedly rendered to MB1 at each of these companies.

49. Medicare claims data show that through ABIX, Company D and Company E billed Medicare using MB1's Medicare information for twenty-four chiropractic sessions between on or about May 15, 2012 and on or about November 21, 2012, amounting to approximately $1,905.00.

### Claims for Services to MB2

50. On or about May 1, 2013 and May 22, 2013 law enforcement interviewed Medicare beneficiary 2 (MB2).

51. MB2 told law enforcement that he/she had visited Physician A's clinic in Detroit, but had never received any psychotherapy or chiropractic services there. MB2 said that he/she had never visited Company D, Company F, or Company G.

52. Medicare billing records for Company D, Company F, and Company G show that ABIX used MB2's Medicare information to bill Medicare for medical services purportedly given to MB2 at each of these companies. ABIX submitted 72 claims for medical services purportedly provided to MB2 by Company D, amounting to $7,702.00. ABIX submitted 267 claims for medical services purportedly provided to MB2 by Company F, amounting to $31,576.00. ABIX submitted 3 claims for medical services purportedly provided to MB2 by Company G, amounting to $160.00.

53. Based upon the information described below and your Affiant's

experience investigating health care providers, there is reason to believe that a significant portion of ABIX's business is derived from fraudulent or fictitious billings.

54. Based upon your Affiant's training and experience and the facts presented herein, your Affiant respectfully submits there is probable cause to believe that Elaine Lovett and Michelle Freeman have violated 18 U.S.C. §§ 1347 and 1349.

55. As such, your Affiant respectfully requests that an arrest warrant be issued for Elaine Lovett and Michelle Freeman.

_____
Brandon Barks
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed to before me this 4th day of December, 2013.
_____
United States Magistrate Judge
Detroit, Michigan